IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENWOOD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO.   8:23-CR-00427-DCC-1 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| **BERNARDINO DE JESUS** | ) | |
| **RAMIREZ RAMIREZ** | ) | |
| | ) | |
| _____ Defendant | ) | |

**GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE DEFENDANT FROM
PRESENTING PARENTAL CONSENT DEFENSE**

The United States moves to preclude Defendant Bernardino de Jesus Ramirez Ramirez from raising a defense at trial based on MV's parents' consent to MV leaving her home in Newberry with Defendant.  The parties will stipulate that MV's parents consented to MV leaving Newberry with Defendant and in fact directed her to do so.  The Government moves to preclude Defendant from arguing that parental consent is a defense to the charged kidnapping because (1) under 8 U.S.C. § 1232, MV, as an unaccompanied minor, is a ward of the U.S. Secretary of Health and Human Services and its delegates and as such the agency acts in loco parentis; (2) parental consent is irrelevant because MV was sixteen years old at the time of the kidnapping and as such she possessed the ability to decide for herself whether to leave with Defendant; (3) any parental consent stems from an illegal smuggling contract that is per se void and invalid because it was based on deceit and inveiglement; and (4) any argument that Defendant did not know he was breaking the law by holding MV against her will because her parents consented is not an admissible defense.

1

## I.    Facts of the Case

MV, date of birth July 2006, is from a small Guatemalan village and is the oldest of six siblings in her family.  In sixth grade, her parents forced her to withdraw from school.  MV's relationship with her parents deteriorated after she was forced to cease her schooling and her parents became verbally and physically abusive with her.

Despite her parents' abuse, MV remained focused on her goal of continuing her education. A friend of the family introduced MV's mother to Defendant, who was also from Guatemala.  MV's family was told that Defendant, for a fee, could smuggle MV into the United States, where he would arrange for her to have a job.  Defendant explained that he would loan MV the money for the smuggling costs.  MV spoke with Defendant on the phone and explained to him that she wanted to continue her education.  MV agreed to the smuggling contract despite never having met Defendant in person.  Defendant explained to MV the smuggling route and how MV would receive text messages with directions throughout her journey.  Twice MV attempted the smuggling route under Defendant's direction and she was caught and returned to her family in Guatemala. Defendant convinced MV to try the smuggling route one last time.

In October 2022, MV followed Defendant's smuggling route and arrived in  Ciudad Juarez, Mexico.  Defendant directed her to go to a building with a purple X on it, which marked the spot where she would cross from Mexico into the United States.  She was told to wade through the Rio Grande River and turn herself into U.S. Border Patrol once she reached the United States. Defendant instructed MV that when she was apprehended by U.S. Border Patrol, she should provide them with Defendant's name as a family friend here in the United States.  Defendant explained that the U.S. government would then release MV to Defendant.

During this third and final smuggling trip to the United States, Defendant would communicate with MV via WhatsApp messages. Defendant texted messages to MV that read "Hey beautiful, how are you" and "hey baby." These messages concerned MV and made her feel uncomfortable. MV relayed her concerns to her mother, but her mother dismissed MV's concerns and told her that Defendant was not trying to do anything with her.

MV spent approximately three days at a border patrol facility in Texas before she transferred to Youth For Tomorrow, a residential foster care agency in Virginia, on or about October 23, 2022. Youth For Tomorrow is a designated care provider by the U.S. Department of Health and Human Services, Office of Refugee and Resettlement ("ORR").

Youth For Tomorrow assigned MV a caseworker. The caseworker interviewed MV about her trip to the United States and her relationship with Defendant. MV relayed that she had never met Defendant, but that Defendant had arranged for and paid for her trip to the United States. MV explained that she was expected to repay her smuggling debt and that she was going to work as a waitress here in the United States. MV stated that she believed the debt was approximately 25,000 quetzales. The caseworker also asked MV if she had any family in the United States. MV relayed that she had an uncle, Ronaldo Perez, here in the United States and that she would prefer to reside with her Uncle Ronaldo Perez rather than Defendant.

After receiving the above information from MV, the caseworker contacted MV's mother to discuss her trafficking concerns regarding Defendant. MV's mother would not listen to the caseworker and insisted that MV be released to Defendant. The caseworker requested the contact information for MV's Uncle Ronaldo Perez and MV's mother responded that Perez would not act as a sponsor for MV. MV's mother continued to press the caseworker to release MV to Defendant. Over the following days and weeks, the caseworker continued to attempt contact with Defendant

and MV's mother.  Ultimately, MV's mother provided the caseworker with Perez's phone number.  When the caseworker spoke with Perez, he acknowledged the requirements of serving as MV's sponsor and agreed to serve as her sponsor and care for her while in the United States.

In November 2022, Perez and his girlfriend lived in Newberry and shared a home with other individuals.  In order to pass the home background inspection by ORR, Perez and his girlfriend needed to establish their own home.  After saving up money, Perez and his girlfriend rented a new residence in Newberry in March 2023, and approval was granted for him to pick up MV.  In doing so, Perez agreed to a number of stipulations with respect to his sponsorship of MV.  See (Exhibit B, Sponsor Care Agreement).

MV resided at Youth For Tomorrow from October 2022 until her Uncle Ronaldo Perez picked her up from the facility on March 31, 2023.  It bears noting that for the five months she lived at Youth For Tomorrow, Defendant was not on MV's approved contact list and MV did not request to speak with Defendant.  Only MV's mother, father, and Uncle Perez were on the approved contact list.

Despite the prohibition on contacting MV, Defendant engaged in a constant stream of communication with MV's mother.  In fact, a review of Defendant's cellular telephone shows in thousands of messages between Defendant and MV's mother.  Defendant and MV's mother communicated regularly throughout the day and night up and until the day of the kidnapping.  The messages reveal Defendant was obsessed with obtaining physical custody of MV.  In fact, the messages reveal that Defendant was even willing to pay more money in order to obtain physical custody of MV.  In short, he was desperate to have physical custody and control of MV.

MV's mother provided Defendant with Uncle Ronaldo Perez's cellphone number.  Once Defendant had Uncle Perez's cellphone number, he began to regularly contact Perez. Defendant

provided Perez with explicit directions on how to gain approval as MV's sponsor and explained that he had used a similar tactic to obtain the release of other individuals.  See (Exhibit A, 11/30/22 conversations).  Defendant continued to press Perez for his cooperation in obtaining MV under false pretenses.  Defendant explained to Perez that Perez should tell ORR that he would keep MV, but in reality, Defendant would take MV from Perez shortly after she was released into Perez's custody.  See (Exhibit A, 2/12/23 -2/21/23 conversations)  Defendant also offered to pay Perez and to help pay for a house for him to rent to receive MV.  (Id.)

On March 31, 2023, Perez picked up his niece, MV, from the Youth For Tomorrow facility and drove her home to Newberry, South Carolina.  During this time, Defendant bombarded Perez with text messages asking if Perez had MV, demanding that Perez answer his phone, and asking Perez to provide his physical address.  See (Exhibit A, 3/31/23-4/1/23 translated conversation).  On April 1, 2023, Perez texted Defendant confirming that he had picked up MV "but [MV] says she doesn't want to go."  (Id. 4/1/23 text (translated))  Defendant immediately replied with the below text string:

> *Suspect*
> - *4/1/23 Well she told me*
> - *4/1/23 That yes*
> - *4/1/23 Because we talked about it in Guatemala*
> - *4/1/23 Also I don't want her as a woman*
> - *4/1/23 The woman I have is a nurse*
> - *4/1/23 I only want her to work in her own business*
> - *4/1/23 I helped her to help get her family and her ahead*
> - *4/1/23 Because in addition I'm about to put the money for her brother to come*
> - *4/1/23 The reality*
> - *4/1/23 I like to help people*
> - *4/1/23 I want to bring her brother*
> - *4/1/23 Instead of the dad coming here*
> - *4/1/23 Yes* [MV] *said that she was going to come here*
> - *4/1/23 I don't want* [MV] *to earn by the hour*

5

- *4/1/23 I want her to see what she is going to make in a short time but in her own business*
- *4/1/23 Thank God I have the ability to help people I do it from the heart without interest of anything*
- *4/1/23 I want that you fulfill your word that you said that you would deliver* [MV] *to me*
- *4/1/23 You know well that I put all the money*
- *4/1/23 The only favor I asked was to receive her*
- *4/1/23 I want you to think that no one helped* [MV] *when she was in Guatemala*
- *4/1/23 I have received many of them and I keep helping people*
- *4/1/23 You know that the contract was made and promised to send her to me*

(Exhibit A, 4/1/23 text (translated)).  Perez responded by explaining that he had agreed to pick up MV and serve as her sponsor – but he did not agree to release MV to Defendant.  Defendant redoubled his efforts to obtain MV and offered to pay Perez.

*Suspect*
- *4/1/23 Yes because the truth is that you want me to pay you for receiving her*
- *4/1/23 Just put a price*
- *4/1/23 And I will transfer the money now*
- *4/1/23 Just say how much is it and I will send it to you*
- *4/1/23 And I will go get her*

(Exhibit A, 4/1/23 texts (translated))  Perez did not respond to these texts.

Once MV arrived in Newberry, South Carolina with her Uncle Perez and his girlfriend, MV knew she had made the right decision to live with them.  She repeatedly told her parents that she did not want to go with Defendant and that she did not care about the smuggling debt.  In response, her parents became increasingly aggressive with her and her mother even told her she could forget she had a mother if she did not go with Defendant.  Her mother told her the smuggling debt would increase if she did not go with Defendant and that if she went with Defendant no interest would be charged on the smuggling debt.

On April 5, 2023, Perez and his girlfriend went to work and left MV at the house.  MV heard a man knocking on the door and believed it was a friend of her uncle's.  When she opened the door, Defendant asked her if she was "[MV]" and then said her mother had given him permission to come get her.  Defendant told MV that she would be deported if she did not go with him and then he told her that the two of them should call her mother.  When MV's mother got on the phone, her mother stated that MV needed to go with Defendant and that she would be deported if she did not go with MV.  Defendant and MV's mother also told her the smuggling debt would go up if she did not leave with Defendant.  MV then proceeded to try and call her Uncle Perez and his girlfriend, but she was unable to reach them.  MV left them a message explaining that she had to go with Defendant because they said she would be deported if she stayed.

MV then packed her suitcase and left with Defendant.  When she got into Defendant's van, Defendant told her she was fat and that in the picture MV's mother sent him she was skinny.  MV spoke no English and she had no money with her.  She had been in the United States five months knowingly only her uncle, his girlfriend, and the employees at Youth For Tomorrow.

Defendant drove MV to his residence in Kansas City, Missouri.  During the drive, Defendant asked MV if she had a boyfriend, to which MV responded "yes" in hopes of deterring Defendant from any advances.  Defendant asked MV to pretend that they were a couple because others harassed Defendant about not having a girlfriend.  He told her that one day he could be her father's son-in-law.  While in route from South Carolina to Missouri, Defendant remained in contact with MV's mother.  Defendant texted MV's mother that "you have to work on [MV] so that she doesn't give the address of the house to Ronaldo."  (Exhibit B, 4/5/23 text message (translated)

When they arrived in Kansas City, Defendant showed MV to a small dirty room in the basement of the house and provided her a key to the room.  MV had only a blanket.  MV slept against the door that night, fearful of Defendant or someone entering the room.

Meanwhile, in South Carolina, Perez and his girlfriend returned home from work to find MV's message stating that she had to leave with Defendant.  Perez and his girlfriend followed the strict instructions provided by Youth For Tomorrow and contacted law enforcement and Youth For Tomorrow.  Law enforcement responded and tracked Defendant's cell phone to his residence in Kansas City, Missouri.  Katerina Verme, a case manager with Youth For Tomorrow, also tried telephoning Defendant multiple times to see if he had MV.  Defendant refused to accept the calls and ultimately texted Verme that  MV's parents did not want her to talk to Verme.

The following day, April 6, 2023, law enforcement recovered MV from Defendant's residence in Kansas City, Missouri.  When law enforcement arrived at Defendant's house, Defendant sent his last cellular messages to MV's mother stating, "they have me captured, they came for the girl, but tell her not to come out" and another message stating "tell [MV] not to come out."  (Exhibit C, 4/6/23 WhatsApp voice message (translated)).

After recovering MV from Defendant's home, law enforcement interviewed MV and notified Perez.  Perez then drove to Missouri, picked up MV, and returned with her to South Carolina.

## II.    Parental Consent is Irrelevant Because ORR and Its Designees Have Custody of MV, an Unaccompanied Minor.

Title 8, United States Code, Section 1232(b), entitled "Combatting child trafficking and exploitation in the United States," provides that the care and custody of unaccompanied minors like MV rests with the Secretary of Health and Human Services.  The statute explicitly requires the "Secretary of Health and Human Services, Secretary of Homeland Security, Attorney General,

and Secretary of State [to] establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity…."  8 U.S.C. § 1232(b)(1).  The Office of Refugee and Resettlement (ORR) is the agency responsible for caring for unaccompanied minors and ORR, in turn, contracts with various care providers to house and care for unaccompanied minors.

The law further provides that

an unaccompanied alien child may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child.

8 U.S.C. § 1232(b)(3)(A).

ORR was involved in the care and custody of MV in this case.  After approximately three days at the border patrol facility, ORR transferred MV to Youth For Tomorrow in Virginia.  The Youth For Tomorrow employees were granted custody of MV and cared for her pursuant to ORR guidelines and policies.  Youth For Tomorrow, in coordination with ORR, also undertook the responsibility of identifying a suitable sponsor with whom MV could reside.

MV, as instructed by Defendant, provided Defendant's name and contact information to Youth For Tomorrow as a potential sponsor.  In conducting its due diligence, Youth For Tomorrow asked MV about her relationship with Defendant.  MV explained that she had never met Defendant and that Defendant paid for and arranged her trip to the United States.  Youth For Tomorrow immediately recognized these statements for what they were – indicators of a sex and/or labor trafficking situation.  Youth For Tomorrow proceeded to speak with MV's mother to address these

concerns.  In response, MV's mother disregarded the trafficking warnings and insisted that Youth For Tomorrow release MV to Defendant.  MV's mother confirmed the smuggling debt and that MV would be working in the United States to assist in repayment of it.  Youth For Tomorrow refused to grant the mother's request and instead asked the family to provide the name of another potential sponsor.  After some time, the mother provided Youth For Tomorrow with Ronaldo Perez's name, MV's uncle.

ORR, via Youth For Tomorrow, exercised its statutory and regulatory authority to investigate Defendant as a potential sponsor.  Notably, as outlined above, Youth For Tomorrow and ORR sought out a sponsor other than Defendant over the very vocal objection of MV's mother. The agency did so because it deemed Defendant to be an unsuitable sponsor in light of the acknowledged smuggling debt owed by MV and that MV would be working in the United States, in violation of federal law, to pay back her smuggling debt.

Because parental consent was not sufficient to override the statutory and regulatory authority of ORR and Youth For Tomorrow, parental consent is not a viable defense for Defendant's kidnapping charge.  Parental consent is insufficient to bestow Defendant with the authority to take MV from her legal sponsor over her objection, ORR and Youth For Tomorrow's objections, and her sponsor's objection.  Defendant's actions, with or without parental consent, constitute kidnapping in violation of 18 U.S.C. § 1201.[1]

### III.    Minor Victim Was Fully Capable of Exercising Her Own Free Will on April 5, 2023, and She Did Not Consent to Defendant Taking Her Across State Lines.

---

[1] The Tenth Circuit has recognized that an individual acting in loco parentis by "voluntarily performing all of the duties a parent normally provides to his or her child" cannot be prosecuted for kidnapping the child under § 1201.  *United States v. Floyd*, 81 F.3d 1517, 1524 (10th Cir. 1996). Because ORR and its designees had custody of MV and expressly declined to allow Defendant to serve as her sponsor, any claim that he is immune from prosecution because he was acting as a "surrogate parent" must fail.

Evidence of MV's parents' consent to Defendant taking her from Uncle Perez's home is irrelevant because MV was sixteen years old at the time of the kidnapping, and she did not consent to Defendant taking her from her uncle's house in Newberry to Missouri. The Supreme Court has held that courts should look to the consent of the parents or legal guardian in a kidnapping case only where the victim is so young as to be "incapable of having a recognizable will." See Chatwin v. United States, 326 U.S. 455, 460, 66 S.Ct. 233, 90 L.Ed. 198 (1946). Parental consent is relevant only "when a minor lacks capacity to consent based on their age or circumstances." United States v. Simpson, No. 2:19-cr-29, 2023 WL 2986848, at *5 (D. Vt. Apr. 18, 2023). MV had the capacity to decide whether she wanted to leave South Carolina with Defendant. She did not.

MV's parents arranged for MV to travel alone through Guatemala and Mexico and into the United States aided only by texts and telephone calls with Defendant and his fellow human smugglers. MV's parents found their sixteen-year-old daughter capable of undertaking significant risks and navigating complex legal and cultural barriers to immigrate to the United States. MV certainly possessed the capacity to determine whether or not she wished to reside with Defendant or her Uncle Perez in April 2023. She repeatedly informed her parents and Defendant that she wished to reside with her Uncle Perez and his girlfriend.

Defendant and MV's mother recognized that MV possessed the mental capacity to make her own decision on April 5, 2023. This is evidenced by Defendant and MV's mother falsely representing to MV that she would be deported if she did not leave with Defendant and that her smuggling debt would accrue significant interest if she did not leave with Defendant. MV only got into Defendant's car after Defendant and MV's mother made these false representations and she was unable to reach her Uncle Perez to test the veracity of the statements. Defendant and MV's mother inveigled MV within the meaning of 18 U.S.C. § 1201 to gain her cooperation in

11

leaving with Defendant. The April 5, 2023 messages between Defendant and MV's mother show that Defendant knew MV had the capacity to object and that MV did not want to go with Defendant.

A sixteen year old is competent to determine whether or not she wishes to travel across the country with a stranger. Sixteen year olds can work jobs, drive cars, and care for others such as the elderly or young, amongst a host of other adult activities. Courts have acknowledged the mental capacity of minors in a variety of contexts. For example, in South Carolina, a teenager over 14 years of age must consent to an adoption or relinquishment. See S.C. Code Ann. § 63-9-310(A)(1). Also, courts routinely find and admit evidence and testimony from minors – many of whom are far younger than sixteen years old.

Here, MV's parents' consent is irrelevant because MV was fully capable of exercising her own free will, and she repeatedly told her parents and Defendant that she wished to remain with her Uncle Perez, not to travel with Defendant.

## IV.    The Parental Consent Is Void Because It Stems from an Illegal Smuggling Contract and Was Based on Deceit and Inveiglement.

Even if, as a general matter, evidence of parental consent could support an admissible defense, it would not do so in this case because MV's parents' consent was void. The parents' consent was based on an illegal smuggling contract that is per se void, and it is invalid because it was based on deceit and inveiglement.

First, other courts have repeatedly found that a smuggling contract is void ab initio and does not amount to consent.[2]  See United States v. Spezzia, 307 F. App'x 853, 855 (5th Cir. 2009)

---

[2] It bears noting that even if the smuggling contract were enforceable, MV disputes the terms of it. Contrary to Defendant's representations, MV never agreed to live with Defendant. While she understood a smuggling debt would be incurred and that Defendant told her that she would be

("Although Spezzia suggests that Miguel consented to be smuggled into the United States in exchange for a fee, such a contract was void ab initio and conferred no right on Spezzia to engage in conduct that would otherwise violate the HTA."); United States v. Sanchez-Angeles, 138 F. App'x 642, 645 (5th Cir. 2005) ("Even if the illegal aliens initially consented to the smuggling arrangement, such a contract was void ab initio and conferred no right on Sanchez-Angeles to engage in conduct that would otherwise violate section 1203."). Any evidence that MV's parents consented to the smuggling contract cannot be used to support an argument that, because of the contract, they consented to her being taken from Newberry to Missouri.

Second, any parental consent from MV's parents is invalid because it was the product of Defendant's deceit and inveiglement of MV and her parents regarding the smuggling debt. At all times material to this case, MV's parents resided in Guatemala and were fed information from Defendant. MV's parents mistakenly believed that MV needed to go with Defendant because she had incurred a smuggling debt with him and that interest would be charged on the debt if she did not go with Defendant. Thus, any such parental "consent" is invalid because it resulted from Defendant's deceit. See United States v. Leveille, No. 1:18-cr-2845, 2022 WL 17475488, at *4 (Dec. 6, 2022, D.N.M.) ("Parental consent for a child to go with another adult is invalid when it is the result of inveiglement or other deceitful means." (citing United States v. Eason, 854 F.3d 922, 923–24 (7th Cir. 2017) (defendants inveigled adoptive parents of minor kidnapping victims by providing false documentation of qualifications to care for foster children))), *withdrawn and superseded*, 671 F. Supp. 3d 1266 (D.N.M. 2023).

---

released to him after crossing the border, she did not understand this to mean she had to live with Defendant.

Judge Posner addressed a similar issue in <u>Eason</u>, wherein the court affirmed the defendant's kidnapping conviction based on the "inveiglement" of the minor victim's parents. Consent that is based on lies is simply not consent. By way of example, Judge Posner reasoned:

> Suppose the defendants had gone to the adoptive parents' homes pretending to be medical personnel, and once there had convinced the parents that because of a polio epidemic the defendants had to take the children to a local hospital to be vaccinated. They would thus have been inveigling the parents as the means of absconding with the children.

<u>Id</u>. at 924. Judge Posner went on to explain that defendants in such a scenario were "inveigling the parents as the means of absconding with the children" and such actions would certainly constitute kidnapping under federal law. <u>Id</u>. Like the vaccination example above, Defendant gained physical custody of MV by misrepresenting to MV and her parents the enforceability of the smuggling debt and that her smuggling debt would increase.

**V.    Any Argument that MV's Parents' Consent Led Defendant to Believe He Was Legally Taking MV Is Not an Admissible Defense.**

To the extent Defendant contends that the parental consent led him to believe that taking MV was permissible, this still does not constitute an admissible defense to federal kidnapping under 18 U.S.C. §1201. The essence of the crime of kidnapping only requires general intent. <u>See United States v. Jackson</u>, 248 F.3d 1028, 1031 (10th Cir. 2001) ("Based on a 'plain language' analysis, the district court was correct in concluding the kidnapping statute requires only general intent."). A defendant need only hold or confine the victim; he need not have actual knowledge that doing so was against the law. <u>See United States v. Sneezer</u>, 983 F.2d 920, 922 (9th Cir. 1992). Defendant "need not have intended to violate the law to commit the crime of kidnapping, but instead must have intended to do the act proscribed—that is: take, hold, or conceal [MV]." <u>United States v. Leveille</u>, No. 18-cr-2945, 2023 WL 5984384, at *7 (Sept. 14, 2023, D.N.M.) (citing

Eason, 854 F.3d at 925). It is not a defense that Defendant did not know the law prohibited taking, holding, and concealing MV.[3] Id.

Defendant was intentional in driving cross country to South Carolina, lying to her about deportation, threatening the escalation of an unenforceable smuggling debt, removing her from her sponsor's home, and driving her 1,000 miles to his home in Missouri. With or without parental consent, Defendant possessed the necessary intent to take and hold MV, i.e. to kidnap MV.

---

[3] In United States v. Van Metre, 150 F.3d 339, 350 (4th Cir. 1998), the Fourth Circuit noted § 1201 required the government to prove that the defendant abducted the victim "for any reason which would in any way be of benefit" to him. The court said "[o]ne way for the government to satisfy this specific intent requirement was to prove that [the defendant's] purpose in abducting [the victim] was, from the very start, for his own sexual gratification." Id. Although the court referenced "specific intent," it seems to have been referring to the specific requirement that the government prove the defendant abducted the victim intending to receive a benefit—not holding that kidnapping is a specific intent, rather than a general intent, crime.

After Van Metre, the Fourth Circuit recognized in United States v. Dietz, 443 F. App'x 781, 788 (4th Cir. 2011) (argued but unpublished), that the text of the kidnapping statute requires specific intent only as to the interstate transportation element. But addressing the defendant's argument on appeal, the court assumed without deciding that § 1201(a)(1) requires specific intent as to all elements. Id.

The South Carolina Pattern Jury Instructions confine the willfulness requirement to the interstate commerce element. Ruschky & Shealy, *Pattern Jury Instructions for Federal Criminal Cases*, District of South Carolina, 18 U.S.C. § 1201 (2024 Online Edition).

## V. Conclusion

The Court should preclude Defendant from raising any defense at trial based on MV's parents consenting to MV leaving her home in Newberry with Defendant.

Respectfully submitted,

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY

BY:    /s/*Carrie Fisher Sherard* (Fed ID. 10134)
Carrie Fisher Sherard
Assistant United States Attorney
55 Beattie Place, Suite 700
Greenville, SC 29301
Telephone:  (864) 282-2100
Email:  Carrie.A.Fisher@usdoj.gov

AND

BY:    /s/*Kathleen Michelle Stoughton* (Fed ID. 12161)
Kathleen Stoughton
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, SC 29201
Telephone:  (803) 929-3114
Email:  Kathleen.Stoughton@usdoj.gov

Dated:  March 29, 2024